IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| JANE CHERA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 3:07-0165 |
| ) | Judge Trauger |
| WILLIAM H. PENN, JR. and ) | |
| SCOTT CHAFFIN, in their individual ) | |
| capacities, and METROPOLITAN ) | |
| GOVERNMENT OF NASHVILLE AND ) | |
| DAVIDSON COUNTY, ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM

Pending before the court is the Motion for Summary Judgment filed by defendants William H. Penn, Jr., and Scott Chaffin. (Docket No. 30.) For the reasons discussed herein, the defendants' Motion for Summary Judgment will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

The plaintiff, Jane Chera, is the sole proprietor of the Windsor Properties, which owns the Windsor Apartments, consisting of twelve individual apartment units located at 1707 Acklen Avenue, in Nashville, Tennessee.[1] The remaining defendants in this case, William H. Penn, Jr.,

---

[1] Unless otherwise noted, the facts are drawn from the parties' summary judgment briefs (Docket Nos. 34, 49, 50 [duplicate filing with certificate of service] and 53), the plaintiff's Response to Defendants' Statement of Undisputed Material Facts (Docket No. 44) and related affidavits and exhibits. Although facts are drawn from submissions made by both parties, on a motion for summary judgment, all inferences are drawn in the light most favorable to the non-

1

and Scott Chaffin, work for the Metropolitan Government of Nashville and Davidson County Department of Code Administration (DCA). Defendant Penn is an assistant director of the DCA and chief of the DCA's Property Standards Division. Defendant Chaffin is an inspector for the Property Standards Division. In March 2005, Chaffin became responsible for inspections in DCA District 18, which includes the Windsor Apartments.

On November 4, 2005, Chaffin responded to a complaint that junk and debris had collected in the common areas of the Windsor Apartments. After conducting an inspection of the Windsor Apartments, Chaffin issued a Notice to Correct Violation to Windsor Properties, which the plaintiff contends she did not receive. On November 22, 2005, a tenant in apartment A-3 of the Windsor Apartments called the DCA to complain of electrical problems in his unit, including electrical surges and burning electrical outlets.

The parties disagree as to whether Chaffin performed an inspection pursuant to this complaint or pursuant to subsequent complaints of residents at the Windsor Apartments that arose in the December 2005 to January 2006 time frame. The defendants claim that Chaffin investigated this complaint and numerous subsequent complaints during this period. The plaintiff contends that there was, at most, one preliminary investigation of the Windsor Apartments during this period. In support of their version of the facts, the defendants rely on convincing documentary evidence and affidavits. The plaintiff, on the other hand, relies on one statement, taken out of context, made by Penn's supervisor, DCA Director Terrence Cobb, in a

---

moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).

2

February 10, 2006 letter.

The defendants contend that Chaffin inspected the electrical problem in unit A-3 on December 1, 2005. In support of this point, the defendants, among other things, have provided a computer print-out of the complaint file, which contains an area for the inspector's post-inspection notes. In this area, Chaffin has noted: "first inspection - 12/01/2005 - comments - building-n-disrepair." (Docket No. 31 Ex. 5.) The defendants also contend that Chaffin performed a re-check of unit A-3 on December 9, 2005, which found, among other issues, electrical problems in the kitchen and extensive interior plumbing problems. In support of this point, the defendants, among other things, have provided Chaffin's signed "Dwelling Unit Inspection Record." (Docket No. 31 Ex. 6.) The defendants further contend that, on December 9, 2005, Chaffin inspected two other units at the Windsor Apartments, in which he found, among a host of issues, similar electrical and plumbing problems. In support of this point, the defendants, among other things, have provided Chaffin's signed "Inspection Record" for both units. (Docket No. 31 Exs. 7 and 8.) The defendants also assert that, on January 19, 2006 and January 23, 2006, Chaffin performed additional inspections of the conditions at the Windsor Apartments. In support of this point, the defendants, among other things, have provided the computer print-out of the original November 22, 2005 complaint file which, in the inspector's post-inspection notes area, contains the notations "re-check - 1/19/06 - comments - regular inspection" and "written notice - 1/23/06 - 90/Regular/Repair." (Docket No. 31 Ex. 5.)

Despite this documentary evidence, the plaintiff argues that there was, at most, one DCA inspection of the Windsor Apartments in this time frame. (Docket No. 44 at 10-11.) The

3

plaintiff relies exclusively on the fact that, on February 10, 2006, after the events that gave rise to this lawsuit, DCA Director Terrence Cobb wrote a letter to the residents of the Windsor Apartments stating: "[s]ince speaking with Ms. Chera, I have learned that our department has made only a preliminary inspection of one apartment unit at 1707 Acklen Avenue and the common areas." (Docket No. 1 Ex. 5.) In this litigation, Cobb has submitted a sworn affidavit detailing that this statement (as is clear from the context) was based on information provided by the plaintiff and was not based on an independent review of the department's records of what inspections had taken place at the Windsor Apartments.[2] (Docket No. 54 Ex. 1.)

On January 23, 2006, defendant Penn issued a "Notice to Repair" letter to the plaintiff that detailed sixteen deficiencies throughout the Windsor Apartments complex, including "sub-standard wiring," "sub-standard plumbing" and inadequate heating. (Docket No. 31 Ex. 9.) The notice also detailed numerous electrical and other problems present in the individual units that Chaffin had inspected, and the notice demanded that the problems be corrected within ninety days. (*Id.*) The plaintiff contends that the notice was sent to addresses at which she did not live or pick up mail. (Docket No. 44 at 11-12.)

On January 31, 2006, Chaffin, DCA Electrical Inspector Tim VanDeGejuchte, and Metropolitan Fire Marshal Inspector Thomas Goad met at the Windsor Apartments to discuss the

---

[2]While recognizing the inferences that the court must make in the plaintiff's favor, the court simply cannot credit the plaintiff's version of the events here. All of the surrounding circumstances reflect that numerous inspections, locating many substantial problems with the Windsor Apartments, were conducted by Chaffin in the December 2005 to January 2006 time frame. The plaintiff's version of events is simply not credible, and the court, therefore, rejects the notion that only one inspection of the conditions at the Windsor Apartments took place in this time period.

4

problems at the complex. Goad conducted an inspection of the property, which revealed nine fire code violations that he outlined in a February 7, 2006 "Notice to Submit Corrective Action Plan" to the plaintiff. (Docket No. 31 Ex. 11.) VanDeGejuchte also conducted an inspection and provided a memo to the DCA outlining five electrical code violations observed during that inspection. (Docket No. 31 Ex. 12.) In affidavits filed in this case, both Goad and VanDeGejuchte state that the problems they observed were potentially life-endangering, with VanDeGejuchte stating "based on my inspection and the electrical code violations I observed, it is my opinion that there existed imminent danger of failure of the electrical system which endangered the lives of the occupants" of the Windsor Apartments. (Docket No. 31 Ex. 13-14.)

On February 2, 2006, Chaffin requested that the DCA issue letters of relocation to the occupants of the Windsor Apartments. On February 3, 2006, Penn mailed a "Notice to Vacate" to each tenant, and a copy of each notice was also sent to the plaintiff. The notices to vacate, in bold and underlined type, informed the tenants of the Windsor Apartments that their unit was "unfit for human habitation" and that the occupants of the unit "are hereby notified to vacate [the unit] on or before: IMMEDIATELY." (See Docket No. 31 Ex. 15.) Also on February 3, 2006, Penn sent a Certification of Displacement Because of Code Enforcement to Nashville Metro Social Services, Homeless Services Division, for each unit at the Windsor Apartments. This certification informed Social Services that the unit was "unfit for human habitation" and advised Social Services that tenants in the unit "MUST VACATE THE ABOVE PROPERTY IMMEDIATELY" and recognized that "this notice will directly result in the displacement" of the unit's tenants. (See Docket No. 31 Ex. 16.) On February 8, 2006, members of Metro Social

5

Services arrived at the Windsor Apartments to begin the displacement process and provide relocation assistance.

That day, one of plaintiff's tenants called the plaintiff to tell her that Social Services was at the Windsor Apartments, trying to get the tenants to leave the premises. The plaintiff quickly called Cobb, who apparently learned of the notices to vacate and the presence of Social Services for the first time during this phone call with the plaintiff. Cobb, believing that the vacate order was wrongly issued, immediately voided the notices to vacate, and Social Services quickly left the premises. At Cobb's direction, Penn and Chaffin hand-delivered notices voiding the notices to vacate to Windsor Apartment residents that evening. Also that day, Penn sent a letter to the plaintiff stating that the determination to vacate the Windsor Apartments was made "in error" and stating that "[o]n behalf of the Property Standards division, I offer my sincere apologies for any inconvenience this action may have caused you or your tenants. It is our desire to follow the procedures outlined by the Metro Code of laws and in this case we are in error and have taken immediate steps to correct our mistake." (Docket No. 31 Ex. 19.)

On February 10, 2006, Cobb wrote a letter to the residents of the Windsor Apartments as a "further attempt to clarify our department's position with respect to the apartments at 1707 Acklen." (Docket No. 31 Ex. 20.) Cobb acknowledged that his department had made a "serious mistake" and stated that "[w]e admit our mistake. What we did was wrong. I apologize for any inconvenience our actions may have caused. I apologize for any unnecessary concern we may

6

have caused you."[3] (*Id.*) It was also in this letter, as discussed above, that Cobb stated his (mis)understanding that only one preliminary inspection had been conducted at the Windsor Apartments prior to the notices to vacate being issued. (*Id.*) It is undisputed that the plaintiff did not lose any tenants as a result of DCA's notice to vacate.

On February 6, 2007, the plaintiff filed this case, asserting various statutory and common law causes of action against defendants Penn, Chaffin, and the Metropolitan Government of Nashville and Davidson County. (Docket No. 1.) On July 17, 2007, the Metropolitan Government filed a Motion for Judgment on the Pleadings. (Docket No. 25.) As the plaintiff never responded to this motion, the court, finding the motion to have merit, ordered that the Metropolitan Government was dismissed from the case. (Docket No. 26.) On March 31, 2008, noting that the plaintiff had taken no discovery in this case, the remaining defendants Penn and Chaffin filed their pending Motion for Summary Judgment.[4] (Docket No. 30; Docket No. 34 at 2.) After receiving several extensions of time, the plaintiff responded to the defendants' motion on August 7, 2008.

## ANALYSIS

---

[3] The basis for Cobb's opinion that a mistake was made is clear. Metropolitan Code § 16.24.580 states that, when an inspector, based on a preliminary examination, determines that a property is not fit for human habitation, a formal complaint is to be drafted and the owner of the property is entitled to notice of that complaint and a hearing to answer the charges therein. (Docket No. 54 Ex. 2 at 3.) Under § 16.24.240, emergency vacate orders, like those issued in this case, are only to be issued when there is an "imminent danger of failure or collapse" of the structure or when there is some other extreme problem that will imminently cause injury or death to the occupants. (Docket No. 31 Ex. 22.)

[4] The plaintiff supplements her pleading only with her own unsigned, unsworn, and undated statement (Docket No. 43) and the affidavit of her son. (Docket No. 45.) This material mostly restates the facts above.

7

The plaintiff brought this lawsuit under 42 U.S.C. § 1983, asserting violations of the Fourteenth Amendment to the United States Constitution, specifically violations of her procedural and substantive due process rights. (Docket No. 50 at 3-15.) The plaintiff also asserts that the defendants intentionally or recklessly inflicted emotional distress on her (*Id.* at 18, 22-24) and that defendant Penn committed libel against her (*Id.* at 18-22). The defendants have moved for summary judgment on each of these claims.

I.      **Summary Judgment Standard**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). To prevail, the moving party must meet the burden of proving the absence of a genuine issue of material fact as to an essential element of the opposing party's claim. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001).

In determining whether the moving party has met its burden, the court must view the factual evidence and draw all reasonable inferences in the light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). "The court's function is not to weigh the evidence and determine the truth of the matters asserted, 'but to determine whether there is a genuine issue for trial.'" *Little Caesar Enters., Inc. v. OPPCO, LLC*, 219 F.3d 547, 551 (6th Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

8

249 (1986)).

If the non-moving party fails to make a sufficient showing on an essential element of the case with respect to which she has the burden, however, the moving party is entitled to summary judgment as a matter of law. See *Williams v. Ford Motor Co.*, 187 F.3d 533, 537-38 (6th Cir. 1999). To preclude summary judgment, the non-moving party "must go beyond the pleadings and come forward with specific facts to demonstrate that there is a genuine issue for trial." *Chao v. Hall Holding Co., Inc*., 285 F.3d 415, 424 (6th Cir. 2002). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 566 (6th Cir. 2003) (quoting *Anderso*n, 477 U.S. at 252). If the evidence offered by the non-moving party is "merely colorable," or "not significantly probative," or not enough to lead a fair-minded jury to find for the non-moving party, the motion for summary judgment should be granted. *Anderson*, 477 U.S. at 249-52. "A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Hill v. White*, 190 F.3d 427, 431 (6th Cir. 1999) (citing *Anderson*, 477 U.S. at 247-49).

## II.     Plaintiff's Constitutional Claims

To state a claim under Section 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the violation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). "The traditional definition of acting under color of state law requires that the defendant in a

9

Section 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Id.* at 49. (internal quotation omitted). Therefore, the defendants are clearly wrong in their argument that "an individual cannot deprive another individual of due process, whether substantive or procedural." (Docket No. 34 at 7.) The defendants here have clearly acted under color of state law, and the only question is whether the plaintiff's substantive and procedural due process rights were violated. Just as clearly, the court finds that they were not.

### A. Procedural Due Process

The plaintiff asserts that the defendants violated her rights under the procedural due process clause. (Docket No. 50 at 6.) In order to establish a procedural due process claim under Section 1983, the plaintiff must establish: (1) that she has a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment; (2) that she was deprived of that protected interest within the meaning of the Due Process Clause; and (3) that the state did not afford her adequate procedural rights prior to depriving her of that protected interest. *Med. Corp., Inc. v. City of Lima*, 296 F.3d 404, 409 (6th Cir. 2002).

The plaintiff's procedural due process claim fails on the first element. The plaintiff readily concedes that the interest at issue here is her business and personal reputation, which must be sound in order to be an effective and successful landlord. (Docket No. 50 at 8.) It is well settled, however, that "[t]here is no constitutional liberty interest in one's reputation standing alone." *Med. Corp., Inc.*, 296 F.3d at 414 (citing *Siegert v. Gilley*, 500 U.S. 226, 233 (1991)). That is, any claim of injury to reputation must be accompanied by the loss of a

10

government "right, benefit, or entitlement." *Id.* This settled rule of law applies whether the interest is one of personal or business reputation. *Id.* at 416. As the plaintiff has conceded that the interest at issue here is her personal and business reputation, the procedural due process aspect of her Section 1983 claim fails as a matter of law.

### B. Substantive Due Process

The plaintiff also asserts that the defendants violated her rights under the substantive due process clause. The interests protected by substantive due process are significantly narrower than the interests protected by procedural due process and "include those protected by specific constitutional guarantees ... freedom from government actions that 'shock the conscience' and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental," such as the right to care when in the custody of the government and the right to travel in public spaces. *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003). "Where government action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so long as it is rationally related to a legitimate state interest." *Valot v. SE Local Sch. Dist. Bd. of Education*, 107 F.3d 1220, 1228 (6th Cir. 1997).

Here, the plaintiff argues that "lying to its citizens is not a legitimate province of local government. Falsely informing occupants of a building that the building has been declared unfit for habitation when in fact that is not true is not and cannot be a legitimate governmental objective. There can be no question that the Defendants' dishonest and oppressive use [] of governmental power cannot be justified." (Docket No. 50 at 12-13.) That is, the plaintiff

11

appears to be arguing that her substantive due process rights were violated because the defendants' conduct was not rationally related to a legitimate state interest, not because her fundamental rights were violated or because the defendants' actions "shock the conscience." Plainly, the plaintiff confuses the manner in which the government acted with whether the government had any right to act at all. The defendants' actions, while later judged to be an incorrect application of the Metropolitan Housing Code, were obviously related to a legitimate state interest, that is, ensuring that the residents of the Windsor Apartments lived in safe and sanitary housing conditions. There is no merit to the plaintiff's substantive due process claim, and the defendants are entitled to summary judgment on that claim.[5]

## III.  Plaintiff's State Law Claims

As noted above, the plaintiff has also asserted state law claims against the defendants, specifically claims for intentional and reckless infliction of emotional distress against both defendants and a claim for libel against defendant Penn. For various reasons, the defendants are

---

[5] In her Complaint, the plaintiff includes in her Section 1983 action a claim that her equal protection rights were violated, that is, government officials treated her differently from other similarly situated people without a rational basis for doing so. (Docket No. 1 at 11 citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). The defendants moved for summary judgment on this claim, and the plaintiff did not advance any equal protection argument in her response brief. Even if the plaintiff had not apparently abandoned this claim, the claim would still be fatally flawed. A rational basis for the government's differing treatment of the plaintiff is clear from the documentary evidence and the affidavits provided by the defendants in discovery, including the reports of the fire marshal and electrical inspector that indicated that there was an imminent risk of harm to the residents of the Windsor Apartments. As there is no violation of the plaintiff's constitutional rights here, it is not necessary to address the defendants' qualified immunity defense. *See Harlow v. Fitzgerald*, 457 U.S. 800, 816 (1982).

12

entitled to summary judgment on these claims.[6]

### A. Infliction of Emotional Distress (Intentional or Reckless )

Whether the emotional distress that the plaintiff alleges is claimed to have been brought about recklessly or intentionally, it is settled that a successful claim here requires that the defendant's conduct have been "outrageous." *See Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville*, 154 S.W. 3d 22, 39 (Tenn. 2005). That is, the conduct alleged must be "atrocious" and "utterly intolerable in a civilized community." *Id.* Also, the leading Tennessee cases involving outrageous conduct canvass the entire factual record before the court, which permits the court to evaluate, in total, whether a series of more benign events add up to "outrageous" conduct, or whether a more troubling event is mitigated by the course of events

---

[6] While the defendants are entitled to summary judgment on the plaintiff's common law claims, it is important to note that the doctrines of immunity advanced by the defendants are not applicable here. First the defendants claim that they are immune from suit because they exercised a "discretionary function" under the Tennessee Governmental Tort Liability Act (TGTLA). (Docket No. 34 at 15-16.) As the plaintiff correctly points out, however, TGTLA/discretionary function immunity only attaches to government entities, not to individual governmental employees. *Fann v. City of Fairview*, 905 S.W. 2d 167, 174 (Tenn. Ct. App. 1995). Under Tennessee law, governmental *employee* immunity arises where, under the TGTLA, the government has waived its immunity from suit. *Sallee v. Barrett*, 171 S.W. 3d 822, 826 (Tenn. 2005). In those situations, the government entity is the proper party, not the employee. *Id.* Under the TGTLA, the government has specifically preserved its immunity in the case of libel and "infliction of mental anguish," including cases where "outrageous conduct" is alleged. *Id.* (citing T.C.A. § 29-20-205(2)). Therefore, the defendants, not the governmental entity, are the proper parties here and are not immune from suit on TGTLA grounds. Further, the defendants are not entitled to immunity based on the "public duty" doctrine, which "shields a public employee from suits for injuries that are caused by the public employee's breach of a duty owed to the public at large." *Ezell v. Cockrell*, 902 S.W.2d 394, 397 (Tenn. 1995). The "public duty" exception applies in the context where a public servant is supposed to protect the public and fails to do so, not in the situation here, where the public servant took affirmative steps, directed at the plaintiff, which supposedly injured her. *See id.* at 397-99.

13

that occurred prior to or subsequent to the more troubling event. *See e.g. Id* at 24-31; *Miller v. Willbanks*, 8 S.W. 3d 607, 609-10 (Tenn. 1999).

Here, the defendants summarily issued an order to all of the residents of the Windsor Apartments to vacate their units "IMMEDIATELY" because their units, which in most cases the defendants had not actually examined, were "unfit for human habitation." While an argument can certainly be made that the defendants took a drastic action with undue haste, there is nothing to indicate that their motives were anything but to ensure the safety of the residents at the Windsor Apartments. To the court, this point strongly counsels in favor of finding that this conduct was not, as a matter of law, "atrocious" or "utterly intolerable" such that the conduct is "outrageous."

Further, the defendants took numerous steps to mitigate the consequences of their conduct, which further indicates that, as a matter of law, their conduct was not "outrageous." The night the notices to vacate were voided, the defendants went back to the Windsor Apartments and personally notified as many of the residents as possible that the notices to vacate had been issued in error. (Docket No. 44 at 14.) Also, that same day, defendant Penn wrote the plaintiff and took full responsibility for the incident and offered his "sincere apologies." (Docket No. 31 Ex. 19.) Certainly, the defendants' efforts to mitigate the consequences of their actions strongly weakens any claim that the conduct at issue was "outrageous." Again, the torts of intentional infliction of emotional distress and reckless infliction of emotional distress do not punish conduct that is "hasty and rash"; they punish conduct that, considering all the circumstances, is "outrageous." *Doe 1 ex rel. Doe 1*, 154 S.W. 3d at 39. Because, on this

14

record, the court finds that a reasonable jury could not find this conduct to be "outrageous" as defined by Tennessee law, the plaintiff's claims for intentional infliction of emotional distress and reckless infliction of emotional distress must fail.

### B. Libel

Finally, the plaintiff asserts a claim of libel against defendant Penn, alleging that Penn libeled her when he wrote his February 3, 2006 letters to the residents of the Windsor Apartments, which identified the plaintiff as the owner of the individual units that he was classifying as "unfit for human habitation" and implied, according to the plaintiff, that the plaintiff was a "slumlord." (Docket No. 50 at 12, 18-22.) The plaintiff is extremely confident in her libel case, even inviting the court to find libel was committed as a matter of law. (*Id.* at 22.) In spite of the plaintiff's confidence, the court finds that defendant Penn is entitled to summary judgment on this claim as well.

In Tennessee, both libel and slander are considered to be defamation. *Isbell v. Travis Elec. Co.*, No. 99-52, 2000 WL 1817252, *5 (Tenn. Ct. App. Dec 13, 2000). The basis for any defamation action is that the defamation resulted in an injury to the person's character and reputation. *Id.* To establish a *prima facie* case of defamation, the plaintiff must show that a party published (communicated to a third person) a defaming statement with either an intentional, reckless, or negligent disregard for the truth of that statement. *Id.* A defaming statement is one that is more than simply "annoying, offensive, or embarrassing," but rather, construing the words in their plain and natural import, a statement that would subject the plaintiff to "public hatred, contempt, or ridicule." *TIG Ins. Co. v. Titan Underwriting Managers, LLC*,

15

No. 07-1977, 2008 WL 4853081, *5 (Tenn. Ct. App. Nov. 7, 2008). That is, to be actionable, the statement at issue must constitute "a serious threat to the plaintiff's reputation." *Id.* Consistent with this point, "proof of injury is required in a defamation claim ... the plaintiff must show that her standing in the community and her public reputation for character has been injured by the alleged defamatory statement and that as a result she has suffered real or actual damages due to that loss of standing or reputation." *McLeay v. Huddleston*, No. 05-2118, 2006 WL 2855164, *9 (Tenn. Ct. App. Oct. 6, 2006).

It is on this final point, as to damages, that the plaintiff's claim is most clearly untenable. The plaintiff has not come forward with any evidence that these statements, even assuming that they were made negligently and were defaming of the plaintiff, caused the plaintiff any injury. It is undisputed that the plaintiff lost no tenants as a direct result of Penn's February 3, 2006 letters. (Docket No. 44 at 16.) The plaintiff submits, however, that "the plaintiff is unable to determine what effect the defendants' extreme and outrageous actions may have had upon any tenant who subsequently vacated the apartment building." (*Id.*) Plainly, the time for this brand of speculation has passed, and such information could have been easily obtained in discovery. Moreover, the speculation appears unwarranted. The defendants have come forward with affidavits from two residents of the Windsor Apartments who testified that they knew of no one in the twelve-unit complex who moved out because of the defendants' actions. (Docket No. 31 Exs. 24-25.) Further, the testimony of these two individuals shows that, in the end, the notices to vacate caused a curious few days, but it quickly became clear to the residents at the Windsor Apartments that there was no need for concern. Further, the same residents who received the

16

notices to vacate also received the letter from Cobb that, in no uncertain terms, completely disavowed the notices' accuracy. As the plaintiff has failed to raise an issue of material fact as to whether "her standing in the community and her public reputation for character has been injured by the alleged defamatory statement and that as a result she has suffered real or actual damages due to that loss of standing or reputation," defendant Penn is entitled to a judgment as a matter of law on the plaintiff's defamation claim.

## CONCLUSION

For the reasons stated above, the defendants are entitled to summary judgment on all of the plaintiff's claims, and, therefore, the defendants' Motion for Summary Judgment will be granted.

An appropriate order will enter.

                               _____
                               ALETA A. TRAUGER
                               United States District Judge